STATE, BY HARRY H. PETERSON, ATTORNEY GENERAL, v.
JOHN W. BENTLEY AND OTHERS.
JOSEPH CREESE AND OTHERS, RESPONDENTS.[1]

May 19, 1950.

Nos. 34,983, 34,984, 34,985, 34,986, 34,987, 34,988, 34,989, 34,990.

[1]Reported in 45 N. W. (2d) 185.

*J. A. A. Burnquist,* Attorney General, and *Victor J. Michaelson,* Special Assistant Attorney General, for appellant.

*E. V. Cliff, Carl J. Eastvold, C. J. Benson, Edwin C. Kraus, George T. Havel, and R. D. Jones,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

The state appeals from judgments granting a perpetual flowage easement in eight cases, which were consolidated for trial below

and on appeal before this court. Respondents were petitioners in intervention in a condemnation proceeding commenced by the state in June 1935 to acquire property in fee title for a work relief and flood control project across the Minnesota River at the south end of Big Stone Lake. The condemnation proceeding has been before this court twice on petitions for intervention. State, by Peterson, v. Bentley (Medbery Brothers), 216 Minn. 146, 12 N. W. (2d) 347, and State, by Peterson, v. Bentley (Frank Nelson), 224 Minn. 244, 28 N. W. (2d) 179, 770. Those decisions will be referred to hereinafter as the Medbery case and the Nelson case, respectively. The Nelson case involved the same·interveners as those who are respondents on this appeal. The Medbery case involved other interveners, but parties who were not included in the original petition for condemnation. Both proceedings are enlargements of the original 1935 petition.

The original condemnation proceeding was instituted by the attorney general on June 26, 1935, to acquire fee title to lands located in Big Stone county, Minnesota, near the city of Ortonville, in connection with the construction of a work relief project known as "F. A. 1—Big Stone-Whetstone Project." The petition recites that it was necessary to maintain the water in the reservoir to be established as part of the flood control dams and dikes at an elevation not to exceed 968 feet sea level datum. Authority for the project was a resolution by the executive council of the state of Minnesota to acquire the necessary land under the power of eminent domain. Under L. 1935, c. 51, the legislature appropriated a $5,000,000 emergency fund authorizing the executive council to acquire any land needed to carry on the work relief and employment.[2]

[2]L. 1935, c. 51, reads:

"An act authorizing the State Executive Council to extend direct relief, drouth relief, work relief and employment to the needy, destitute and disabled persons within the State of Minnesota; to appropriate money therefor and to authorize the Executive Council to issue certificates of indebtedness to be represented by tax levy certificates to cover such appropriation; authorizing the State Board of Investment to purchase said certificates of indebtedness from the State trust funds; to authorize the State Executive Council to disburse said funds to such Federal and State relief agencies as

534

Commissioners in the original proceeding to ascertain the amount of damages were appointed September 18, 1935. These commission-

may to said Council seem just and proper and for the best interests of the citizens of the State of Minnesota; to purchase lands and materials needed to carry on such direct relief, drouth relief, work relief, and employment; and to convey land to the United States in certain cases; authorizing the State Board of Investment to purchase certificates of indebtedness to be issued for the purpose of providing the funds necessary to carry out the provisions of this Act and authorizing the State Auditor and State Treasurer to sign said certificates of indebtedness and authorizing the State Board of Investment to purchase the same at an interest rate of three per cent and for other purposes.

"Be it enacted by the Legislature of the State of Minnesota:

\* \* \* \* \*

"Section 1. There is hereby appropriated out of the relief fund hereinafter created the sum of Five Million Dollars ($5,000,000) to be available for the fiscal year commencing at once and ending July 1, 1936, and the further sum of Five Million Dollars ($5,000,000) to be available for the fiscal year ending July 1, 1937, for the purpose of aiding in furnishing necessary direct relief, drouth relief, disabled veterans relief, work relief and employment relief to needy, destitute and disabled persons within the State of Minnesota in connection with federal, state and local agencies.

"Sec. 2. In extending work relief or re-employment for needy, destitute and disabled persons within the State of Minnesota, the Council may undertake projects involving flood control, water supply, water diversion, control of erosion, reforestation and afforestation, and recreation and any other project which will aid in the conservation and development of the natural resources of the State and for the promotion and conservation of the health, safety and general welfare of the people of the state.

"The Council is authorized to acquire by gift, purchase, condemnation proceedings under Mason's Minnesota Statutes of 1927, Chapter 41, as amended, *or otherwise*, any land needed to carry on the work relief and employment herein provided for and, in appropriate cases, to convey land to the United States needed for projects financed in whole or in part by the United States.

"Sec. 3. Said sums of money are appropriated to and made available to the Executive Council of the State of Minnesota to be disbursed by said Council, from time to time as needed, to the various federal, state and municipal agencies for the purpose of furnishing aid and relief to needy, destitute and disabled persons within the State of Minnesota as herein provided as may to said Executive Council seem just and proper." (Italics supplied.)

ers filed their report with the clerk of the district court on October 25, 1935. Work on the project began in the fall of 1935 and was completed in the spring of 1937, but no certificate of completion, as required by M. S. A. 117.20(4), was ever filed in the original proceeding[3] or in subsequent proceedings.

In January 1938, the owners of the Medbery lands, about one-half of which are located in Minnesota and about one-half in South Dakota, filed a petition in intervention by which they sought to bring their Minnesota land into the condemnation proceeding, asserting damage by flowage and a taking by the state. Their lands, like the lands of the owners in the cases at bar, had not been included in the original condemnation proceeding. That petition came on for hearing August 29, 1942, at which time the Medberys amended their petition to include damages for the years 1937 to 1942, inclusive. The Big Stone Canning Company petitioned to intervene in the Medbery proceeding on October 12, 1942. The facts, proceedings, and appeals are found in State, by Peterson, v. Bentley, 216 Minn. 146, 12 N. W. (2d) 347, *supra.* This court there held that the original condemnation proceeding was still open and that the court below was authorized, by virtue of its inherent power and under the intervention statute (§ 544.13), to permit intervention of the landowners to recover just compensation. The Medbery de-

---

[3]M. S. A. 117.20 provides in part:

"In eminent domain proceedings instituted by the state or by any of its agencies or political subdivisions as petitioners under the provisions of this chapter the procedure shall be as follows:

*　*　*　*　*

"(4) The notice of filing of report provided for in section 117.09 shall be dispensed with; as shall also the final decree provided for in section 117.17, provided the attorney for the petitioner make a certificate describing the land taken and the purpose or purposes for which taken, and reciting the fact of payment of all awards or judgments in relation thereto, which certificate upon approval thereof by the court shall establish the rights of the petitioner in the lands taken and shall be filed with the clerk and a certified copy thereof filed for record with the register of deeds; which record shall be notice to all parties of the title of the state or of its agency or political subdivision to the lands therein described;".

cision also refused a writ of prohibition over the lands located in South Dakota. On application for reargument, this court stated that the only question which remained was the value of each parcel of property taken, and the cases were remanded to the district court.

The present proceedings, which were commenced by motions to intervene in the original 1935 proceeding, were filed at various dates ranging from the petition of William C. Braun on August 22, 1942, to that of Elmer Schiefelbein and Joseph Creese on February 15, 1946. All petitions in intervention alleged that the lands, although not included in the original condemnation proceeding, were in fact damaged and taken as a result of the construction and operation of the project. Each landowner demanded compensation for the taking. The state answered, denying the court's jurisdiction, since all funds had been exhausted and authority for the project had been terminated; alleging that the project had been completed in 1937; setting up the six-year statute of limitations as to both* the Minnesota and South Dakota actions based on a contract implied in fact; and denying the court's jurisdiction over the South Dakota lands. The state admitted that no final certificate of completion had been filed in the original eminent domain proceeding.

The case was tried below on the issue of a taking of title and a perpetual flowage easement rather than for a trespass. This was understood by the court and by counsel for all parties. The court denied the state's motion that the petition stated no cause of action and that it gave no jurisdiction over the South Dakota land. After a trial on the issue of a taking, the court filed its order May 24, 1946, granting the petition of interveners; determining that the lands owned by respondents here had been taken up to an elevation of 976 project datum level; and appointing commissioners to determine the amount of damages. The state appealed from an order denying its motion to amend the order appointing commissioners or, in the alternative, for a new trial. We held that such an order in a condemnation proceeding is nonappealable (State, by Peterson, v. Bentley [Nelson] 224 Minn. 244, 28 N. W. [2d] 179, 770), on the

ground that appellants could not do indirectly what they were not permitted to do directly.

After the decision in the Nelson case, the commissioners assessed damages to each parcel of land and filed their award with the clerk of the district court on August 8, 1947. The commissioners' award was filed as of April 13, 1937, based upon the acquisition of a perpetual flowage easement at the date the project was completed and placed in operation. The state appealed from that award. The issue of damages only was tried before the court and a jury in October 1947. The footnote table[4] shows the jury's verdict and interest awarded from April 13, 1937, with the judgment total in each case. The present appeals are from those judgments.

The lands involved in the appeal are variously located in Traverse and Big Stone counties, Minnesota, and in Grant and Roberts counties, South Dakota. The lands of respondents Joseph Creese, A. I. Reed, Edward F. Frevert, Ella Frevert, and Virginia and Clarence Kolb are situate in Grant and Roberts counties, South Dakota, and are riparian to the west shore of Big Stone Lake. The Nelson and Braun lands are in Big Stone county, Minnesota, and are riparian to the east shore of Big Stone Lake. The lands of Albert and Elmer Schiefelbein are about one-half mile north of the lake near the village of Browns Valley, Traverse county, on the east of, but not riparian to, Big Stone Lake. Big Stone Lake is fed by the

| [4]Number | Party | State | Verdict | Interest | Costs | Judgment Total |
|---|---|---|---|---|---|---|
| 34983 | Joseph Creese | (S.D.) | $3,150 | $2,220.75 | $ 21.91 | $5,392.66 |
| 34984 | Dr. A. I. Reed | (S.D.) | 3,000 | 2,115.00 | 21.51 | 5,136.51 |
| 34985 | Edward F. Frevert | (S.D.) | 6,000 | 4,230.00 | 133.76* | 10,230.00 |
| 34986 | Henry E. Witte, Executor, Wm. C. Braun Estate | (Minn.) | 6,250 | 4,406.25 | 36.06* | 10,656.25 |
| 34987 | Frank Nelson | (Minn.) | 1,200 | 846.00 | 373.81** | 2,419.81 |
| 34988 | Schiefelbeins | (Minn.) | 1,400 | 987.00 | 39.95* | 2,387.00 |
| 34989 | Ella Frevert | (S.D.) | 1,200 | 846.00 | 32.61* | 2,046.00 |
| 34990 | Kolbs | (S.D.) | 1,425 | 1,004.63 | 21.41** | 2,451.04 |

$40,719.27

*Costs already taxed.
**Costs already taxed but included in the judgment total.

Little Minnesota River. The water flows out of the dam and control works near Ortonville.

The position of interveners at the trial on the issue of the taking was that the operation and design of the dam, dike, and control works, which was placed in operation on April 13, 1937, resulted in a flooding and permanent flowage of their lands up to datum level 976. The state, on the other hand, introduced testimony of an engineer and consultant of the department of conservation to show (a) that the taking was not permanent, since the original high-water mark as shown by the tree line about the lake remained as it was before the dam was placed in operation; (b) that the dam and dikes, with their openings, could handle the volume of water coming from the lake; and (c) the size of the watersheds of the Whetstone and Little Minnesota Rivers. The state relied heavily on this engineer witness, who had not seen the area or premises in a state of nature prior to 1937 and who formed his conclusions from published data and plans rather than from observations of conditions prior to 1937.

M. E. Chamberlin, interveners' expert witness, was an independent civil engineer of wide experience, whose lifework had included drainage engineering studies and flood control design for projects in the Big Stone Lake area and who had lived at or near Big Stone Lake for many years prior to 1937. He testified that the diversion of the Whetstone River so that it intersected the Minnesota River above the control works caused a reduced flow of the water from Big Stone Lake and the dam, because the channel below the lake was of insufficient capacity to accommodate the continued flow of the Minnesota and Whetstone watersheds; the dam and dike openings were insufficient, in his opinion, to release the necessary water flow. The witness admitted that there was unusual rainfall and water flow in 1942, but said that in a state of nature the lower Minnesota valley below Big Stone Lake would have been sufficient to carry off the volume of water contributed by Big Stone Lake. He was familiar with earlier floods in 1919 and high-water levels of the lake in 1891 and 1898, which had not resulted in flooding

interveners' lands. It was his opinion that the dam and control works were not properly designed to accommodate such flood periods.

Sidney A. Frellsen, an engineer in the department of conservation, testified that he had no records of how many control logs were in place to hold water from the overflow spillways from 1937 to and including the 1942 and 1943 flood periods and that the state had no plan of operation for the works until after March 1943.

The state's consulting engineer, Adolph S. Meyer, had been on the ground in about 1910, in 1919, and again in 1937. He testified that if no stop logs were used and if the sluice gates were wide open it would be possible to keep the lake level at 968 according to design specifications. His conclusions were based on computations for the years 1937-1939 and 1942-1944. He testified, however, that he knew the lake levels only for the year 1944. On cross-examination, Meyer stated that in operation a flowage easement higher than 968, perhaps to 970, would have to be taken. He admitted that flood conditions would take the lake level higher than 968, assuming that there were no stop logs and that the gates were wide open, but it was his opinion that the lake level would have gone higher in a state of nature in a flood similar to those in 1942 and 1943.

Witnesses for interveners testified that they had seen stop logs in place on the dam in 1942 and 1943.

On the issue of damages, the court charged the jury to find the values of the property damaged as of April 13, 1937, directing the jurors expressly to go back ten years to find how much damage a flooding to 976 datum level would cause the landowners on that date. In addition, the court charged:

"It appears, of course, that the easements were taken as of April 13, 1937. For that reason, the various landowners will be entitled to interest on the amount which you find and include in your verdicts from April 13, 1937, to the date of payment, and the Court will compute and add that amount of interest to your verdicts. You should keep that in mind because that interest is the compensation of the landowner for the delay in payment. You should not

consider any other factors, but I consider it important that you know just what provision will be made for the landowner for the delay that has taken place between the taking and the payment of compensation."

In the judgments the court awarded interest from April 13, 1937. The state makes numerous assignments of error, which raise the. following questions argued in appellant's brief:

(1)  Did the district court have power and jurisdiction to impose a perpetual flowage easement above datum level 968, which was the only level included in the original condemnation proceedings?

(2)  Does the record sustain a finding that a taking occurred on April 13, 1937, up to elevation 976, where there was no evidence of any flooding until the years 1942 and 1943, which the state contends were years of unusual and unprecedented rainfall?

(3)  Was the court below in error in directing the jury to compute damages as of April 13, 1937, and in adding interest to the jury verdicts from and after April 13, 1937, to the date of judgment?

(4)  Did a Minnesota district court have jurisdiction to make, enter, and enforce the judgments of condemnation entered against the lands situate in South Dakota?

(5)  Did the six-year contract statute of limitations in Minnesota and South Dakota become a bar to petitions in intervention filed more than six years after April 13, 1937?

We are of the opinion that, with the exception of the question of interest, all the questions must be answered in favor of respondents under the facts and circumstances of this case.

■  The law of this case, to the extent that interveners are petitioning to enlarge the original condemnation proceeding commenced in 1935, is set forth in the Medbery case (State, by Peterson, v. Bentley, 216 Minn. 146, 12 N. W. [2d] 347). That decision involved the same legislative authority, the same action of the executive council, the same flood control construction project, and the same constitutional right to compensation for damages. The only differences between that action and the present one are differences in the

parties and the particular tracts of land involved. However, that decision established that where the final certificate required by § 117.20(4) had not been filed the condemnation proceeding was still open and that the court was authorized to permit the intervention of other and new landowners.[5] State, by Peterson, v. Bentley, 216 Minn. 146, 157, 12 N. W. (2d) 347, 353-354.

In the Medbery case, the state raised the same arguments as it does here, namely, that the condemnation proceeding was legislative in nature; that the executive council's authority had terminated; and that the taking could extend only to the levels on property included in the original petition. What we decided in that opinion in holding that the district court had jurisdiction in these condemnation proceedings applies to the same issues raised in this appeal arising out of the same proceeding over which the court had already acquired jurisdiction. Those decisions should be treated as the law of the case, and the questions cannot be reëxamined at this late time. Cf. Terryll v. City of Faribault, 84 Minn. 341, 87 N. W. 917; G. N. Ry. Co. v. City of Minneapolis, 142 Minn. 308, 172 N. W. 135; In re Improvement of Robert Street, 167 Minn. 525, 209 N. W. 632; Bruns v. Town of Nicollet, 186 Minn. 259, 243 N. W. 74; International Boom Co. v. Rainy Lake River Boom Corp. 112 Minn. 104, 127 N. W. 382; State ex rel. Village of Clara City v. G. N. Ry. Co. 132 Minn. 474, 157 N. W. 1069. See, 1 Dunnell, Dig. & Supp. § 401. And apparently it makes no difference that the subsequent appeal is made by a different party to the same action. Cf. Bruns v. Town of Nicollet, 186 Minn. 259, 243 N. W. 74, *supra;* Conery v. New Orleans Waterworks Co. 42 La. Ann. 441, 7 So. 590. See, 2 Black, Judgments (2 ed.) § 527; Annotations, 34 L. R. A. 321, 324. However, where the parties on the second appeal are different, the proper reason for sustaining the decision on the first appeal in the same action would appear to be on grounds of *stare decisis* rather than *res judicata,* or estoppel by judgment. 2 Black, Judgments

---

[5]This procedure no longer has our approval. Mandamus to compel the agency to initiate condemnation proceedings is now the appropriate procedure. State, by Peterson, v. Anderson, 220 Minn. 139, 151, 19 N. W. (2d) 70, 76.

(2 ed.) § 527, note 113. Where a person becomes a party by intervention after commencement of an action, he becomes a party to the judgment whether or not the court had jurisdiction over him originally, provided that before the judgment is finally rendered he appears as a party and has had a chance to be heard. On the other hand, he is not bound upon issues decided before his intervention where he cannot object to the decision upon issues which had been previously framed and decided. See, Restatement, Judgments, § 79, *comment f.* Here, the state has appeared and has been heard on the same issues of law before this court. On principles of *stare decisis,* it should be bound in this action until the final judgment (which is the certificate required by M. S. A. 117.20[4]) has been filed.

■ We are of the opinion that the evidence sustains the court's finding that a taking had occurred up to the maximum water level of the dam up to datum 976.

This case is distinguishable from Poynter v. County of Otter Tail, 223 Minn. 121, 25 N. W. (2d) 708, and Mitchell v. City of St. Paul, 225 Minn. 390, 31 N. W. (2d) 46, which involved unprecedented flow of water in watercourses designed to take the rainfall reasonably to be anticipated. It is true that those cases involved the extraordinary rainfall years of 1942 and 1943. However, in the Poynter case, the diversion project was expressly designed to consider the preceding 25 years' average flow. And in the Mitchell case, the rainfall raised the water level of Lake Vadnais to the highest level in its recorded history and did damage to other areas, roads, walls, and lanes within a few miles of the lake. In the instant case, there is some evidence, which the court could consider in establishing the level of the taking up to datum 976, of unusual floods on water levels for the years 1873, 1891, 1898, and 1919 (spring and fall).

In view of the testimony of the state's experts Meyer and Frellsen and that of Chamberlin for respondents, which clearly indicates that the dam and diversion controls created a more restricted overflow channel, particularly in the area below the dam and the

control works, than in a state of nature, we are of the opinion that the following finding of the court in the order granting intervention and appointing commissioners was supported by the evidence:

"Such controlled pool levels were higher and were different than they would have been if said works had not been constructed and operated, and the pool level of said Big Stone Lake had been left in its natural state of nature."

And the rainfall data at Fort Snelling, while persuasive as to the general area of Minnesota and South Dakota, might not be at all accurate for a given watershed or river valley unless closely adjacent to that watershed.

■ A more difficult question arises because of the court's charge to the jury on the issue of damages, directing it to find damages as of April 13, 1937. That is the date of the completion of the dam and project. Use of that date is consistent with the court's findings that a taking took place because of the design of the works and lack of adequate channel for the flow from the dam. It is true that no harm or actual damage occurred to the lands of interveners until 1942 and 1943. However, the action here is to enforce the rights of the Minnesota interveners under Minn. Const. art. 1, § 13. As indicated by the Medbery appeal, the idea of a "taking" is sometimes difficult to define with exactness.

In Burnquist v. Cook, 220 Minn. 48, 52, 19 N. W. (2d) 394, 397, this court pointed out that the language of M. S. A. 117.02, subd. 2, expressly defines "taking" to "include every interference" with the ownership, possession, enjoyment, or value of private property.[6] This legislative inclusion of every interference with the value of property is broad enough to include the erection of structures which may later in fact reduce the value of ownership or of enjoyment of the property. We cannot say from this record that it was re-

---

[6]M. S. A. 117.02, subd. 2, provides:

"The word 'taking' and all words and phrases of like import include every interference, under the right of eminent domain, with the ownership, possession, enjoyment, or value of private property."

versible error in view of what later occurred in fact, particularly in 1942 and 1943, to determine that a taking occurred upon completion of the project. We need not decide here what the result would have been had no actual harm occurred up to the time of the trial. Nor are we approving the submission to the jury of the date of completion as the date of valuation for future cases.[7]

We hold that the error is not prejudicial and that it does not justify a new trial on the issue of damages, particularly since the correct date would have been the date of the first award of the commissioners in the original proceedings, October 25, 1935. It must be remembered here that under the court's instructions given October 28, 1947, the jury was advised that its sole task was to determine how much each parcel of land was reduced in value, fixing the amount which would be fair and just as of April 13, 1937. It is doubtful, when considering values more than ten years in retrospect, whether the jury would have materially changed its awards one way or the other had it attempted to fix these values as of October 25, 1935, instead of April 13, 1937. We must take judicial notice of the fact that on either of those dates land values generally were suffering the effects of a prolonged depression and probably did not change to any material extent between October 25, 1935, and April 13, 1937. See, 91 U. of Pa. L. Rev. 671, citing cases holding that the time of valuation can be at any step in the course of the condemnation and particularly at the date when the condemnation petition is filed.

■ The determination of interest clearly is defined by statute. Section 117.16 provides that all damages allowed under the eminent domain chapter, whether by the commissioners or upon appeal, "shall bear interest from the time of the filing of the commissioners' report." The commissioners' report in the original proceed-

---

[7] Value is usually determined as of the date of the commissioners' report or award. Winona & St. Peter R. Co. v. Denman, 10 Minn. 208 (267); Carli v. Stillwater & St. Paul R. Co. 16 Minn. 234 (260); but cf. Oronoco School Dist. v. Town of Oronoco, 170 Minn. 49, 212 N. W. 8 (sufficient to charge reasonable value). See, Ford Motor Co. v. City of Minneapolis, 143 Minn. 392, 173 N. W. 713.

ing was filed October 25, 1935. The petition in intervention was granted to enlarge that original proceeding. However, there is nothing in the record to show that interveners either appealed or cross-appealed from the judgments, so the date used by the trial court for the computation of interest on the awards will stand.

We are not prepared in this case to review our decision in the Medbery appeal, to the effect that the district court could acquire jurisdiction for the purpose of awarding damages to the owners of South Dakota lands.[8] That decision remains the law of the case on this appeal, even though it may be open to reëxamination on other facts not arising out of this condemnation proceeding. Cf. Johnson v. N. W. Tel. Exch. Co. 54 Minn. 37, 55 N. W. 829. The question is not one of full faith and credit accorded to a foreign decree over domiciliary land. The situation is peculiar, since rights arising under the Minnesota constitution and the due process clause of the federal constitution are being enforced against the state rather than against a nonresident. Here, the nonresident has invoked our jurisdiction. Cf. Restatement, Judgments, § 5, *comment j*.[9] Probably the proper remedy for the South Dakota interveners would have been a suit in the federal courts. See, Boom Co. v. Patterson, 98 U. S. (8 Otto) 403, 25 L. ed. 206; Olson v. United States, 292 U. S. 246, 54 S. Ct. 704, 78 L. ed. 1236; 28 USCA, § 1343(3). However, in the instant case, as in the Medbery case, the South Dakota interveners voluntarily invoked our jurisdiction, and in view of the fact that the interveners in the case at bar are in the same position as those in the Medbery case, which we are consider-

---

[8]See, *Recent Cases,* 29 Minn. L. Rev. 214; cf. Restatement, Judgments, § 5, *comment i.*

[9]"*j. Effect of ruling by the court as to its jurisdiction.* Although a judgment would otherwise be void because of the lack of jurisdiction of the court over the parties or over the subject matter, and would therefore be open to collateral attack, yet if the court determines that it has jurisdiction, the parties may be precluded from collaterally attacking the judgment on the ground that the determination by the court of its jurisdiction is res judicata between them. (See §§ 9, 10.)"

ing as the law in the condemnation próceeding, we are making our determination on the basis of the Medbery case.

■ Since the Medbery and Nelson appeals established the law of the case as to these interveners, it is not necessary to consider the issue of the statute of limitations of South Dakota and Minnesota. The Medbery decision made clear that the origin of the rights being enforced in our courts against the state was constitutional. The reference to contractual rights was only by way of analogy to show that the proceedings were not entirely in rem. This court said in that case (216 Minn. 164, 12 N. W. [2d] 357):

"* * * The mere fact that condemnation as to the South Dakota property could not, as such, vest in the courts of our jurisdiction is not the problem confronting us. The question is whether the owners are without redress because they are nonresidents and because the land taken is outside the state of Minnesota."

Furthermore, the entire proceedings, which these interveners were permitted to join in the Nelson appeal, had been conducted under the provisions of M. S. A. c. 117. The only statute of limitations in that chapter is found in § 117.20(4), which provides for the filing of the final certificate by the state or its agencies. Since it is admitted that a certificate has not been filed in this condemnation proceeding, we fail to see how the contract statutes of limitation of either Minnesota or South Dakota are material. Cf. State, by Youngquist, v. Hall, 195 Minn. 79, 261 N. W. 874.

Affirmed.

ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On June 23, 1950, the following opinion was filed:

PER CURIAM.

The state of Minnesota appeals from the taxation of costs and disbursements.

The rule is that when the state acts in its sovereign capacity costs and disbursements cannot be taxed against it except as otherwise provided by law. State ex rel. Smiley v. Holm, 186 Minn. 331, 243 N. W. 133; State, by Peterson, v. Bentley, 224 Minn. 244, 28 N. W. (2d) 179, 770.

While it is true in the above condemnation proceedings that the state was acting in its sovereign capacity, M. S. A. 117.20(2) provides for the allowance of costs and disbursements to the prevailing party in the event of an appeal from an award of damages or from an omission to award damages. In State, by Peterson, v. Bentley, *supra,* costs and disbursements were not allowed, but in that case we held that an order granting a motion to intervene in condemnation proceedings, determining that property had been taken, and appointing commissioners to ascertain damages was not an appealable order.

Here, we have a situation where the state appealed from judgments in which damages were awarded respondents, who were petitioners in intervention in the condemnation proceeding. They were the prevailing parties upon the appeal in the instant case, and are entitled to costs and disbursements under § 117.20(2).

UPON PETITIONS FOR REARGUMENT.

On December 8, 1950, the following opinion was filed:

PER CURIAM.

The state's petition and supplemental petitions for reargument are denied. In its supplemental petition, the state raised the question that we indicated in our opinion that interest might have been computed on each jury verdict herein as of October 25, 1935, the date of the filing of the commissioner's report in the original proceeding, instead of from April 13, 1937, the date the trial court imposed the perpetual flowage easement. While we upheld the trial court's date for the computation of interest from April 13, 1937, because of no appeal or cross-appeal from the judgments, the objection by the state is well taken. In order to correct any misunderstanding in that respect, the opinion is hereby modified to clarify the point that interest can only be computed from the date the court imposed the perpetual flowage easement on April 13, 1937, and not from the date of the filing of the commissioner's report in the original proceedings on October 25, 1935.

MR. JUSTICE CHRISTIANSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.