# HOUSING AND REDEVELOPMENT AUTHORITY OF CITY OF ST. PAUL v. ALLAN E. GREENMAN.

96 N. W. (2d) 673.

May 29, 1959—No. 37,620.

*Lewis L. Anderson,* for appellant.

*Harold L. Rutchick, Irving Shaw,* and *Louis P. Sheahan,* Corporation Counsel, for respondent.

MURPHY, JUSTICE.

The principal question presented is whether the respondent, Housing and Redevelopment Authority of the City of St. Paul, a public body corporate and politic created by L. 1947, c. 487, may take property declared to be in a slum or blighted area under the power of eminent domain and later sell such property to private persons pursuant to an area redevelopment plan. The appellant contends that such taking is not

for a public use and is in violation of the prohibition of Minn. Const. art. 1, § 13.

In discussing this issue a brief examination of state and Federal statutes relating to housing, redevelopment, and urban renewal projects will be helpful. Since 1932 the Congress of the United States has passed various forms of legislation designed to assist states and cities in removing the blight of unsafe and unsanitary dwellings. These programs had to do primarily with the establishment of low-cost housing projects in slum areas and were administered through various Federal agencies.[1] From the experience gained in these earlier programs it was found that urban public housing projects are best administered through the instrumentality of a local legally constituted housing authority on a loan and grant basis. The low-rent housing projects created by the United States Housing Act of 1937 (50 Stat. 888, 42 USCA, § 1401, et seq.) provided financial assistance to public housing agencies engaged in the development and administration of low-rent housing and slum clearance (42 USCA, §§ 1402[11], 1409, 1410) by (a) loans up to 90 percent of the development or land acquisition cost of a project or (b) by a system of annual contributions to assist in maintaining the low-rent character of the project.

The Housing Act of 1949 (63 Stat. 413, 42 USCA, §§ 1441 to 1460) extended the scope of previous acts so as to permit a state unit with Federal assistance to go beyond the establishment of low-rent projects and engage in broader urban redevelopment purposes.[2] By this act it appears that Congress abandoned the policy of attempting to solve the slum-clearance problem through a piecemeal approach by condemning limited areas for low-cost housing construction. As the United States Supreme Court said in Berman v. Parker, 348 U. S. 26, 34, 75 S. Ct. 98, 103, 99 L. ed. 27, 38, the legislation was intended:

"* * * to redesign the whole area so as to eliminate the conditions that cause slums—the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas,

---

[1]See, Riesenfeld & Eastlund, *Public Aid to Housing and Land Redevelopment,* 34 Minn. L. Rev. 610.

[2]*Urban Redevelopment,* 54 Yale L. J. 116; Brown, *Urban Redevelopment,* 29 Boston U. L. Rev. 318.

the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented."

In its declaration of policy Congress clearly pointed out[3] that in addition to the elimination of substandard and inadequate housing and the clearance of slum and blighted areas the legislation comprehended the "development and redevelopment of *communities* and * * * the advancement of the growth, wealth, and security of the Nation." (Italics supplied.) Congress further declared that a purpose of the act was to enable "the housing industry to make its full contribution toward an economy of maximum employment, production, and purchasing power." In attaining the objects of the legislation, private enterprise is to be encouraged to serve in its accomplishment, governmental assistance is to be utilized, and appropriate local bodies are encouraged to undertake positive programs to develop "well-planned, integrated residential *neighborhoods,* the development and redevelopment of communities, * * *." (Italics supplied.) Local communities are to have governmental assistance in eliminating substandard housing through the clearance of slums and blighted areas. In qualifying for Federal aid in carrying out these projects, the local authority is required under 68 Stat. 623, 42 USCA, § 1451(c), to furnish a "workable program" to include an official plan dealing with urban slums and blight within the community and for the establishment and preservation of "a well-planned community with well-organized residential neighborhoods * * * and prevent the development or spread of, slums and urban blight, to encourage needed urban rehabilitation, to provide for the redevelopment of blighted, deteriorated, or slum areas, * * *." This legislation comprehends the assembly of a large area of land under the power of eminent domain with power to regulate its future use by providing for it a balanced

---

[3]63 Stat. 413, 42 USCA, § 1441.

character having within its area homes, apartments, schools, commercial structures, parks, and playgrounds.

The state legislature by M. S. A. 462.415 (L. 1947, c. 487, § 2; L. 1955, c. 565, § 1; L. 1957, c. 810, § 1) has made it possible for municipalities in Minnesota to take advantage of grants in aid of urban redevelopment provided by Federal law. By this law the legislature has permitted local units of government to acquire blighted areas by eminent domain for the purpose of slum clearance. In its statement of considerations for the enactment of these laws, our legislature has expressed the policy to be consonant with that stated by Congress in passing the Housing Act of 1949. By § 462.415, subds. 2 and 3, specific authority is given to the municipality for the sale and redevelopment of such land by private parties for commercial purposes. The Minnesota legislature has recognized by that statute:

"Subd. 2. * * * that provision must be made to encourage private enterprise to engage in redevelopment or to provide housing facilities in substandard areas, to be constructed in accordance with such comprehensive plan; that provision must also be made to encourage investment of funds in, and for the acquisition by private enterprise at fair prices of, real property required for such purposes * * * and for public assistance thereto, * * *.

"Subd. 3. It is hereby declared to be the policy to protect and promote the welfare of the citizens of this state by employing all means necessary and appropriate to satisfy the foregoing needs; that * * * the participation in such redevelopment projects * * * properly planned and related to public facilities in such substandard areas, according to a redevelopment plan * * *, by private enterprise, with or without partial tax exemptions, are public uses and purposes for which private property may be acquired and public money may be spent; * * *."

Section 462.445, subd. 4(13), confers the power:

"To own, hold, and improve real * * * property and to sell, lease, exchange, transfer, * * * or dispose of * * * any interest therein."

Section 462.525, subd. 1, provides that:

"In accordance with a redevelopment plan, an authority may make any of its land in a redevelopment project available for use by private

individuals, firms, corporations, * * * or other private interests, * * *"
while § 462.545, subd. 1, states that:

"* * * it is the purpose of this act that authorities will sell * * * the land in the redevelopment area * * * for a variety of purposes, including * * * commercial and other purposes, * * *."

The trial court found that the petitioner, Housing and Redevelopment Authority of the City of St. Paul, is a body corporate and a duly constituted municipal authority under § 462.425, with all the prescribed statutory power to exercise authority conferred upon it under the statutes and that it has in strict conformity with that authority instituted by its petition and statutory notice proceedings in eminent domain for the taking and condemnation of property owned by the appellant. It appears that the appellant's property is located in the city of St. Paul within a large area of land west and south of the state capitol grounds. It is within an area which has been duly declared to be a blighted slum and deteriorated area and identified as the "Western Redevelopment Area Project" as opposed to an equally large area on the other side of the capitol grounds known as the "Eastern Redevelopment Area Project."[4]

---

[4]The following statements are from reports submitted to the City Council of St. Paul and to the Federal Housing Authority by the Housing and Redevelopment Authority of the City of St. Paul:

"Both areas are substandard, both in respect to facilities and because of the physical condition of the structures. According to Census and FHA definitions 61 percent of the dwelling units in both areas are substandard and 30 percent dilapidated.

"These data, however, fail to reveal the full extent of the actual deficiencies."

"Before the commencement of redevelopment the entire area was in a condition of serious deterioration. The Capitol Approach site contained a mixture of residential and commercial uses. * * * The entire area is seriously blighted in terms of practically every index; age of structures, requirement of major repairs, lack of private baths, overcrowding, absentee ownership, prevailing traffic hazards, other environmental nuisances, infestation, deficiency of recreation space and light and air, related indices of disease and social disorganization. * * *

"From the standpoint of city planning, this general area is the city's largest and worst. It blankets the State Capitol zone and lies in a solid front

The particular slum clearance project with which we are here concerned has become identified with the capitol approach program, which is designed to beautify the location upon which the state capitol and state office buildings are situated. The location of the state capitol and grounds, with its possibility for a park-like character, presented an advantageous and attractive focal point for the redevelopment of the area in which the appellant's property is located.

It appears from the exhibits that the tract of land in which the appellant's property is located consists of 66.55 acres. It is not clear from the record for what precise purpose it is intended to use the appellant's property. The plan submitted for the entire area comprehends the following uses:

| | |
|---|---|
| Elevator Apartment Area | 11.6 acres |
| Row or Detached House Area | 5.4 acres |
| Commercial Area | 14.6 acres |
| School and Institutional Area | 7.0 acres |
| Park Area | 6.35 acres |
| Street and Parkway Area | 21.6 acres |

It does not appear that the appellant makes any claim that the proceedings to establish the project area are in any way defective or that the action of the authority in declaring the area as a slum area is arbitrary or unreasonable. The appellant's attack is directed to the constitutionality of L. 1947, c. 487, as amended, on the ground that it violates Minn. Const. art. 1, § 13, which provides:

"Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

He claims specifically that the unconstitutionality of the act derives from the fact that it permits the condemnation of land by eminent domain

---

along the edge of St. Paul. It constitutes a 'zone of avoidance' for normal private development, and offers no incentive for the maintenance of existing properties. Thereby it tends to disestablish the appropriate functions of the city's center.

"The area presents advantages for planning design: (1) it lies athwart the city's focus of circulation which requires wholesale redesign, and (2) it shapes into natural areas for residential and civic redevelopment."

for private purposes.

■ In considering the constitutionality of §§ 462.415 to 462.461 (L. 1947, c. 487, as amended), it is important to keep in mind that statutes are to be construed so as to uphold their constitutionality and carry out the legislative intent, if possible. In Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 173, 91 N. W. (2d) 642, 650, we said:

"* * * since an act [of the legislature] is presumed to be constitutional, it will not be declared unconstitutional, unless its invalidity appears clearly or unless it is shown beyond a reasonable doubt that it violates some constitutional provision. The power of the court to declare a law unconstitutional is to be exercised only when absolutely necessary in the particular case and then with great caution."

See, also, State v. Minnesota Federal Sav. & Loan Assn. 218 Minn. 229, 15 N. W. (2d) 568; State v. Donovan, 218 Minn. 606, 16 N. W. (2d) 897.

■ We have held in many cases that the exercise of the right of eminent domain and condemnation proceedings in furtherance of that right are legislative functions of government. The only questions which are judicial are the public use and the adequacy of compensation. State, by Peterson, v. Severson, 194 Minn. 644, 261 N. W. 469; State, by Ervin, v. Appleton, 208 Minn. 436, 294 N. W. 418; Volden v. Selke, 251 Minn. 349, 87 N. W. (2d) 696; State, by Peterson, v. Bentley, 216 Minn. 146, 12 N. W. (2d) 347; 6 Dunnell, Dig. (3 ed.) §§ 3012, 3013, 3014, 3080.

■ It is within the province of the legislature to declare a public use or purpose, subject of course to a review by the courts, and such determination by the legislative body will not be overruled by the court except in instances where that determination is manifestly arbitrary or unreasonable. Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27; Schumm v. Milwaukee County, 258 Wis. 256, 265, 45 N. W. (2d) 673, 677; 18 Am. Jur., Eminent Domain, § 46. In Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643, we observed:

"* * * What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit

to the community as a body and which, at the same time, is directly related to the functions of government."

In In re Condemnation by Dairyland Power Cooperative, 248 Minn. 556, 82 N. W. (2d) 56, we said that judicial restraint demands a deference to the will of the legislature which requires that we assume it intended the power granted should be exercised for a public purpose within the framework of the constitution. Courts will hold the use public unless it manifestly appears by the provisions of the act that it can have no tendency to advance and prosecute such public use. State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585.

■ We have also stated that the notion of what a public use may be changes with time. "Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities." State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 16, 174 N. W. 885, 176 N. W. 159, 161, 8 A. L. R. 585, 588. We have also said that the term of "public use" is flexible and cannot be limited to concepts of public use or purpose held at the time of the forming of the constitution. Stewart v. G. N. Ry. Co. 65 Minn. 515, 517, 68 N. W. 208, 209, 33 L. R. A. 427, 429. In Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643, we said:

"The mere fact that some private interest may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public."

■ Of more immediate application to the question before us is Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175, wherein it was contended that Minn. Const. art. 1, § 13, limits the state's power of eminent domain to those instances where the contemplated use is public in character and that the proposed use of the land to be condemned as a site for low-cost rental housing project did not meet the test because the homes to be built and the class of persons eligible for occupancy were limited. It was held there that the fundamental purpose of the state in the enactment of the particular housing and redevelopment act involved was to

protect the health, safety, and general welfare of the public. We also said that the taking of property for low-rent housing as provided by the act constituted a taking for public use, and the exercise of the power of eminent domain was not in violation of Minn. Const. art. 1, § 13. While the Thomas case did not involve the problem of condemning property for public use and then selling it to private parties for redevelopment by private capital, we did make this significant statement (234 Minn. 236, 240, 48 N. W. [2d] 185, 187):

" '* * * the essential purpose of the legislation is not to benefit * * * any class; it is to protect and safeguard the entire public from the menace of the slums. * * *'

* * * * *

"* * * the existence of slums creates social problems which not only affect people living in the slum district, but, in a sense, the public as a whole. It is our opinion that the elimination of a slum district is a direct benefit to all property owners, even as the establishment of a parkway would be a benefit to them all."

There are many authorities holding that various so-called redevelopment statutes which provide for the exercise of the power of eminent domain, the expenditure of public funds, and the lending of public credit are valid despite provisions for the transfer of lands thus acquired by public authority to private parties. The underlying reason for these decisions is that the acquisition and clearing of blighted areas completely serves a public purpose. The subsequent transfer of these lands to private parties is incidental to the main public purpose. See, Annotation, 44 A. L. R. (2d) 1419.

Perhaps the most cited authority is Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. ed. 27, involving the District of Columbia Redevelopment Act of 1945, which had for its purpose the redevelopment of substandard housing in a blighted urban area. The appellants there argued that the project amounted to a taking of property from one man for the benefit of another. The supreme court, however, held that the means of executing the project was for Congress to determine, once the public purpose had been established (348 U. S. 33, 75 S. Ct. 103, 99 L. ed. 38):

"* * * The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects."

The case of Velishka v. City of Nashua, 99 N. H. 161, 106 A. (2d) 571, 44 A. L. R. (2d) 1406, is a well-considered decision which discusses the validity, construction, and effect of statutes providing for urban redevelopment by private enterprise. That decision pointed out that redevelopment laws similar to the statute challenged here have been enacted in 34 states, the District of Columbia, and 4 territories. The act considered by the New Hampshire court was specially challenged because it allowed the authority to make the land in a redevelopment project available for sale or lease to public or private agencies. They noted that the same contention was made and answered in Gohld Realty Co. v. City of Hartford, 141 Conn. 135, 143, 104 A. (2d) 365, 369:

"* * * The purpose of the act is not only to remove slums and blighted areas but also to prevent the redevelopment areas from reverting to their former status. * * * This is accomplished by requiring as a condition of sales and leases of portions of the area to private persons that the property * * * [be developed or redeveloped for the purposes specified in such plan]. *If the public use which justifies the exercise of eminent domain in the first instance is the use of the property for purposes other than slums, that same public use continues after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished.*" (Italics supplied.)

Although there are holdings to the contrary,[5] the overwhelming weight of authority which we follow is to the effect that, when slum areas have been reclaimed and redevelopment achieved, the public

---

[5]Adams v. Housing Authority of City of Daytona Beach (Fla.) 60 So. (2d) 663; Housing Authority of City of Atlanta v. Johnson, 209 Ga. 560, 74 S. E. (2d) 891; Edens v. City of Columbia, 228 S. C. 563, 91 S. E. (2d) 280; 41 Minn. L. Rev. 219.

purpose has been fully accomplished. The fact that the act does not thereafter insure a continued use for public purpose does not in any way affect the purpose of the act or render the taking of the property a taking for a use or purpose which is not public. "The achievement of the redevelopment of slum and blight areas, as defined in the act, * * * constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved." Zurn v. City of Chicago, 389 Ill. 114, 129, 59 N. E. (2d) 18, 25. It is not the object of the legislation merely to permit the transfer of property from one individual to another. There is a limit to the amount of parks, playgrounds, or public purposes which any community may afford. Where a municipality has no further need of property in a redevelopment area, there should be no reason why it should not be sold, restored to productive use, and become tax-producing property. Authorities which support the respondent's contentions are found in Annotation, 44 A. L. R. (2d) 1421.

Much has been written on the subject of urban renewal and the problems of eliminating and preventing urban deterioration. A recent note in 72 Harv. L. Rev. 504 contains an extensive discussion of the problems of land acquisition, which includes a discussion of the authorities bearing on the disposition of property for development by private capital and control of reuse of such property. This article gathers and discusses the numerous authorities supporting the taking of property for slum clearance and the sale or transfer thereafter to private parties. An examination of this article supports the conclusions we have reached.

It may be further added that the Supreme Court of the United States in Berman v. Parker, *supra,* observed that (348 U. S. 33, 75 S. Ct. 102, 99 L. ed. 38):

"* * * It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

In enacting this legislation the legislature may well have had in mind the aesthetic value which slum clearance would contribute to the state capitol. Situated as it is upon "Capitol Hill," which dominates both

the Eastern and Western redevelopment areas, this imposing edifice is widely recognized as one of the finest examples of governmental architecture. Before the slum-clearance work was undertaken, the capitol was framed by a belt of drab and obsolete buildings which detracted from its appearance. Since the project has started, the surrounding area has taken on a charm and beauty which the original planners might well have envisioned. The capitol now faces a park-like area with wide lawns and boulevards which radiate to the areas which have been included in the redevelopment project. These areas are now for the most part barren and unoccupied. Aside from those parts of the area which might be allocated for parks and other public purposes, the property now awaits development by private enterprise. This development will be controlled by the authority so as to produce a balanced, stable, and integrated community, in keeping with the surroundings.

■ The appellant next argues that L. 1947, c. 487, as amended, in its provisions for the condemnation of appellant's property violates Minn. Const. art. 1, § 7, in that it denies due process. He specifically asserts that no notice was given to the appellant by the Housing Authority of the City of St. Paul of their proposed intention to take the appellant's property. He particularly objects to the constitutionality of M. S. A. 462.521, subd. 2, which provides:

"* * * Once approved, the determination of the authority to undertake such project and the resolution of the governing body shall be conclusive, in any condemnation proceeding, of the public need for such project."

We have examined the typewritten transcript of the proceedings in this case. From it we are satisfied that the property owner had a full hearing on the issue of the reasonableness and the purpose for which the property was taken. We can find no basis for any claimed prejudice that he was not given a notice by the housing authority of proceedings in which it decided to construct the improvement.

"As an owner of land ordinarily has no right to a judicial hearing on the necessity and expediency of a public improvement which will result in the taking of his land, or on the necessity and expediency of

taking his land for the improvement, he has no constitutional right to notice of the proceedings in which it is decided to construct the improvement and its location is fixed, except in such states as, by express constitutional provision, make the necessity of a taking a judicial question. All questions relating to exercise of the eminent domain power, which are political in their nature and rest in the exclusive control and discretion of the legislature, may be determined without notice to the owner of the property to be affected." 18 Am. Jur., Eminent Domain, § 322.

See, 6 Dunnell, Dig. (3 ed.) § 3014.

■ The next point raised by the property owner is that L. 1947, c. 487, as amended, further violates Minn. Const. art. 1, § 13, in that it provides for the taking of property without first paying therefor or securing payment therefor. An examination of the record shows that on May 7, 1956, the housing authority filed its petition for condemnation and for an order appointing commissioners and at the same time filed its application to determine the amounts to be deposited to secure compensation pursuant to § 462.445, subd. 2. The property owner thereafter filed objections to the petition. There was a hearing in district court which continued intermittently from June 4, 1956, to July 16, 1956, during which objections to the proposed taking were duly asserted. On September 17, 1956, the court made its findings of fact and conclusions of law adjudging the statute valid and making its order appointing the commissioners. On September 27, 1956, the housing authority, pursuant to the court's order, deposited $50,000 with the clerk of the district court to secure compensation to the property owner. On May 2, 1957, the commissioners appointed by the trial court to assess damages for the taking filed their report awarding the property owner $26,000. Upon trial the jury found on the issue of compensation that the fair market value of the property as of September 27, 1956, was $36,750 and as of May 2, 1957, was $37,500. The trial court held that the taking of the property occurred on September 27, 1956, coincident with the housing authority's payment into court of the $50,000 deposit to secure compensation for the taking.

This court held in In re Improvement of Third Street, 177 Minn. 146, 225 N. W. 86, 74 A. L. R. 561, in considering a similar statute

which provided that title should vest in the condemning authority upon setting aside of compensation in the city treasury, that there was a sufficient compliance with the constitutional provision in Minn. Const. art. 1, § 13. It is generally recognized in most jurisdictions that, in the absence of a specific requirement in the constitution, compensation need not be paid or even finally determined in advance of the taking, where reasonable, certain, and adequate provision is made at the time of appropriation to ascertain and secure the compensation to be paid to the owner. 18 Am. Jur., Eminent Domain, § 304. Under L. 1947, c. 487, as amended, provision is made by M. S. A. 462.445 to deposit a sum to be fixed by the court to secure compensation to the owner of appropriated property. 6 Dunnell, Dig. (3 ed.) §§ 3016, 3017. We are of the view that under the facts in this case there is no merit to the appellant's claim that the failure to pay compensation in advance of the taking was a violation of his constitutional rights under art. 1, § 13.

■ The next point raised by the property owner is that the court erred in determining the date of damages suffered by the appellant as of September 27, 1956. He asserts that the correct date for determining damages is May 2, 1957, the date on which the commissioners filed their award. This assignment of error has significance in that it involves the question of whether the property owner or the respondent may collect 8 months' rent from the tenant who occupied the property. As we have heretofore indicated, the trial court held that the taking occurred as of September 27, 1956, on the date when the sum of $50,000 was deposited with the clerk of court as security for compensation to the property owner. The fundamental doctrine that private property cannot be taken for public use without just compensation requires that compensation shall be determined as of the time of taking. Minneapolis-St. Paul Sanitary Dist. v. Fitzpatrick, 201 Minn. 442, 277 N. W. 394, 124 A. L. R. 897; Oronoco School Dist. v. Town of Oronoco, 170 Minn. 49, 212 N. W. 8. It is not clear from our decisions, however, as to when a taking occurs. See, City of Minneapolis v. Wilkin, 30 Minn. 145, 15 N. W. 668; Ford Motor Co. v. City of Minneapolis, 143 Minn. 392, 173 N. W. 713; State, by Peterson, v. Bentley, 231 Minn. 531, 45 N. W. (2d) 185; Drake v. City of St. Paul (8 Cir.) 65 F. (2d) 119; Burnquist v. Cook, 220 Minn. 48, 19 N. W.

(2d) 394; Warren v. First Div. of St. P. & P. R. Co. 21 Minn. 424; 6 Dunnell, Dig. (3 ed.) §§ 3016, 3017, 3060; see, also, 29 C. J. S., Eminent Domain, § 185. The conflict in these decisions, which may be more apparent than real, results from the diversity of the various statutes involved as well as the circumstances of the particular case. It may be generally said that property may be regarded as taken at that time when by the terms of the statute the owner is divested of his title and it vests in the condemning party, or when the property is injured. Under § 462.445, subd. 2, it is provided that when the authority deems it necessary it may, after having filed with the court an application to assess compensation for property to be appropriated by condemnation proceedings, "forthwith pay into court a sum of money to secure compensation to the owner of the appropriated property" in an amount to be fixed by order of the court. Thereupon "The title to the property appropriated shall pass to the authority" which shall then have the "right to enter immediately * * * and demolish any structure * * * and proceed with the construction of the project proposed by it." It seems to us that under the plain provisions of § 462.445 the court was correct in determining that the taking occurred on September 27, 1956, the date the deposit was made securing compensation to the property owner.

Affirmed.