CITY OF MINNEAPOLIS, Petitioner,
Appellant,

v.

Margaret YALE, et al., Defendants,

Billy Graham Evangelical Association
(BGEA), Respondent.

No. 47817.

Supreme Court of Minnesota.

Aug. 18, 1978.

Walter J. Duffy, Jr., City Atty., Minneapolis, for appellant.

Fredrikson, Byron, Colborn, Bisbee & Hansen and John A. Cairns and Marsha A. Freeman, Minneapolis, LeVander, Gillen, Miller & Magnuson, So. St. Paul, for respondent.

Heard before PETERSON, SCOTT, and GODFREY, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by the City of Minneapolis (City) from an order of the Hennepin County District Court in a condemnation action against respondent, Billy Graham Evangelistic Association (Association). The main dispute concerns whether an Association building condemned by the City had a sufficient relationship with other buildings owned by the Association so that all the buildings could be considered as a unit for the purpose of valuation of damages. The district court found a unity of use. We affirm.

The City started a condemnation proceeding to obtain a building and parcel of land owned by the Association in October 1974. The building, commonly known as the "Decision Building," was located at 1240 La Salle Avenue in the Loring Park Development District of Minneapolis.

The purpose of the Association is "to spread the Gospel of the Lord Jesus Christ by tracts, books, and other publications." Since the Association was founded in 1950 it has maintained its headquarters in the same general area of Minneapolis. At the time relevant for this appeal, the headquarters area consisted of about ten parcels of land on which the Association's buildings and parking lots were located. Three of the Association's buildings—the Harmon

Building, the Hennepin Building and the Grason Building—were located within the boundaries of one square block. The World Wide Building, another Association building, was situated about a block from the other buildings, while the Decision Building was located approximately one and a half to two blocks from the complex of the three buildings.

The Decision Building, the building taken in the condemnation, accommodated the Association's outgoing mail facility. The building contained stuffing, postage, counting, sorting, labeling, and wrapping machines. From this facility, the Association mailed 50 to 60 million magazines and 50 to 75 million pieces of direct mail, including films and books, each year. The Association was told by the postal authorities that it bought more postage and mailed more pieces of mail than any other mail center in the Twin Cities area. In fact, the operation was so large that the City's own appraiser, Mr. Howard Lawrence, testified he could not recall seeing any mailing facility equally as large.

The Harmon Building contains the Association's executive offices, the accounting and payroll departments, the print shop, the correspondence pool, and the incoming mail department. It also houses the editorial, art, photography, and research staffs for the Decision magazine, the main publication of the Association. The magazine is published in 10 editions, including several foreign language editions. Five of the 10 editions are mailed from the Minneapolis facility and one of these five—the United States edition—is sent to 4 to 4½ million people.

The Hennepin Building contains the Association's computer, the reading department, an employee cafeteria, and two chapels. The Grason Building was used for the processing of orders for books and pamphlets while the World Wide Building housed the Association's filmmaking and distributing organization.

More than 500 persons were employed in these buildings, 100 of whom were employed in the Decision Building mailing facility. Each building was modified or re-modeled after acquisition to accommodate the Association's needs. Substantial modifications were made in the Decision Building after its acquisition by the Association.

Although all these buildings were not located on contiguous parcels of land, the record shows that close functional relationships existed among the buildings. One ADT electronic security system served all the buildings including the Decision Building, as did a security patrol service. The buildings shared a common telephone system and janitorial service. An equipment repair facility, which served all buildings, was located in the Decision Building. A general maintenance department for the complex was located in the Hennepin Building. Daily 15-minute devotional periods were taken by each department in the complex and the two central chapels located in the Hennepin Building were used for this purpose. The cafeteria served free lunches to all Association employees. Employees from the Decision Building came to the Harmon Building to cash their checks. A common supply area, receiving department, interoffice mail system, purchasing system, employee parking lots, computer system, personnel department, and transportation office served all the buildings including the Decision Building.

Other functional relationships among the buildings existed. For example, the quantity of incoming mail varied at times. When the Association received an unusual amount of mail, the personnel department would transfer employees from all departments in the other buildings, including the Decision Building, to work on incoming mail in the Harmon Building. When the volume of incoming mail was reduced, the employees would return to their regular departments. In addition, the department heads, including the manager of the mailing center, would meet in one of the buildings for daily staff meetings. George M. Wilson, the Association's chief executive officer and manager of the buildings, made daily personal trips from the Harmon Building to inspect the Decision Building operations.

The mailing function provided the main link between the Decision Building and the other buildings in the complex. All the mail that went out of the Decision Building came in part from one of the other Association buildings. The various departments in all the buildings contributed names for the Association's mailing lists. The lists were kept in the computer in the Hennepin Building. The mailing lists were updated constantly and parts of them were sent from the computer department to the outgoing mail department in the Decision facility on an hourly basis. The art, photography, layout, and typesetting for the Decision magazine were done in the Minneapolis headquarters. The copy was then sent to an outside printer, who delivered the printed copies back to the mail facility. The other pieces of mail—including the books, Bibles, film catalogs, and daily devotional books—were printed in the Association's own print shop in the Harmon Building and then were mailed from the Decision Building. Approximately 55 percent of the materials processed at the Decision Building mail facility were produced in the Harmon Building print shop. The materials brought from the print shop or other locations were then prepared for mailing, inserted into mail bags, and loaded on semitrailers for delivery to the post office.

The City took title to the Decision Building by warranty deed dated June 6, 1975, pursuant to the "quick take" provisions of Minn.St. 117.042. The Decision Building was then leased back to the Association until it could construct a new facility to house the operations contained in the condemned structure.

A condemnation commission was appointed and awarded $667,800 as damages for the taking of the property. The City appealed this award to the district court and the Association cross-appealed, claiming that the award was less than the true damages.

On appeal to the district court, the Association contended that a unity of use of the noncontiguous tracts existed pursuant to Minn.St. 117.086 and that the measure of damages to be applied at trial should be the difference between the value of the Association's Minneapolis building complex before and after the taking. The district court agreed. The City now appeals to this court, contending that the measure of damages should be limited to the value of the single building and parcel taken.

The only issue on appeal is whether the district court erred in holding that the measure of damages should be the difference between "the value of the [Association] unit before the taking and the value of the remainder of the [Association] unit after the taking herein."

The district court's holding as to the appropriate measure of damages was based on Minn.St. 117.086, subd. 1, which provides:

"In all eminent domain proceedings brought under this chapter *noncontiguous tracts of land may be considered as a unit* for the purpose of the assessment of the damages for a taking from only one of such tracts, provided that *the use to which the tracts are applied is so connected, that the taking from one in fact damages the other.*" (Italics supplied.)

This statute recognizes that noncontiguous parcels of land may be "so connected" in use that the taking of one parcel will damage the remaining parcel. In such a situation, the noncontiguous parcels are to be considered as a unit for the assessment of damages for the taking of one of the parcels. In effect, the statute allows the taking of one parcel to be considered a partial taking of the whole unit. The measure of damages for a partial taking is measured by the difference between the value of the entire tract before the taking and the value after the taking. E. g., *State v. North Star Concrete Co.*, 265 Minn. 483, 122 N.W.2d 118 (1963). This was the measure of damages authorized by the district court, since it was found that, pursuant to Minn.St. 117.086, subd. 1, "there is a unity of use between all the buildings, each building contributing to a part of the total operation and no building alone being able to carry on the total program and function" of the Association.

The City contends that the court erred in finding that the taking of the Decision Building damaged the other noncontiguous properties and that a unity of use existed among the properties. The appropriate standard to be applied in making this determination is the standard contained in Minn.St. 117.086, subd. 1; namely, whether "the use to which the tracts are applied is so connected, that the taking from one in fact damages the other." [1]

The City's claim that the Association's other properties were not in fact damaged by the taking of the Decision Building is based on the assertion that the condemnation helped the Association consolidate its operations. The City relies on the fact that the Association was able, subsequent to the taking, to move the mailing operation to a new building which is directly connected to the other headquarters buildings. We reject this argument. In *Housing Authority of City of Newark v. Norfolk Realty Co.*, 71 N.J. 314, 323, 364 A.2d 1052, 1056 (1976), the New Jersey Supreme Court recently stated:

" * * * The question is not whether the remaining tract can continue to be used if different property is substituted for the condemned parcel, but solely whether there is in fact an integrated use of both *at the time of the taking*. Thus, the mere fact that the remaining property is still adaptable for its present use will not render the noncontiguous tract separate for purposes of severance damage." (Italics supplied.)

Furthermore, in Minnesota, damages in condemnation actions are to be measured by the damage caused at the time of the taking. E. g., *Housing and Redevelopment Authority of St. Paul v. Greenman*, 255 Minn. 396, 96 N.W.2d 673 (1959). Consequently, whatever the Association did to preserve the efficient functioning of its op-

eration after the time of the taking is of no consequence here.

The main contention of the City is essentially that the district court's finding of unity of use was based on insufficient evidence. The evidence, however, is virtually uncontradicted that, at the time of the taking, the entire complex of buildings, including the condemned building, was being used as a common unit and that the taking of the Decision Building damaged the utility of the remaining buildings. At the time of the taking, the Decision Building was adequate for the Association's present and foreseeable future needs. The evidence shows that almost every aspect of the business of the Association depended upon use of the mail. Due to the vast amount of mail processed by the Association and the fact that nearly every article mailed had its origin in one of the other buildings, the Association needed a mailing facility in close proximity to its other operations. In fact, Wilson testified that if on the date of the taking the Association had been unable to temporarily lease back the Decision Building, the Association would have come to a "grinding halt."

The evidence supporting the unity of use of the buildings is overwhelming. The district court conducted a personal tour of the complex and subsequently heard oral testimony over a 2-day period. After so doing, the district court in its findings of fact cited 14 different categories of facts which supported its conclusion that there was a unity of use among all the buildings. Culver E. LaSalle, a professional real estate appraiser, testified on behalf of the Association after spending 30 days appraising the headquarters complex. He concluded that each of the buildings was "an integral and necessary part of the total operation of the Association's ministry" and that the Association could not be operated without a mailing

1. The City contends that the proper standard is found in *Victor Co., Inc. v. State*, 290 Minn. 40, 186 N.W.2d 168 (1971), which provides that "a claim for consequential damages to a physically distinct tract can be established only upon proof that the land taken and the owner's remaining land possess such special adaptability for a particular unitary use and were actually and permanently put to such use, and that a taking of one tract resulted in damage to the tract remaining." *Victor*, however, was decided prior to the effective date of Minn.St. 117.-086, quoted above. We therefore will apply the newer statutory standard contained in Minn.St. 117.086 to this case.

center. According to LaSalle, the Decision Building was an "integral and necessary" part of the entire unit. A review of the record shows that these conclusions have substantial support.

Lawrence was the only witness called by the City. He had visited the Decision Building and was instructed to appraise it as a separate parcel and not as a part of the complex. Since he did not view the other properties, he stated that he had no position as to whether the taking of the Decision Building diminished the value of the Association's enterprise. The City thus presented no witness who could testify as to the unity of use issue.

Consequently, the evidence overwhelmingly supports a finding that the use of the Association's buildings was "so connected" that the taking of the Decision Building damaged the other noncontiguous properties. In fact, a finding to the contrary probably would have been reversible error. The district court was correct in determining the proper measure of damages to be applied, and its decision is therefore affirmed.

Affirmed.