145 N.W.2d 321 (1966)
STATE of Minnesota, by Walter F. MONDALE, its Attorney General, Appellant,
v.
GANNONS INC., et al., Respondents-below, Gannons Inc., Respondent.
Nos. 39867, 39950.
Supreme Court of Minnesota.
August 19, 1966.
Taxation of Costs October 7, 1966.
*324 Robert W. Mattson, Atty. Gen., Perry Voldness, Deputy Atty. Gen., Karl J. Herman, Special Asst. Atty. Gen., St. Paul, for appellant.
Tracy, Rowland & Mertensotto, St. Paul, for respondents.
On Appeal from Taxation of Costs October 7, 1966.

OPINION
NELSON, Justice.
These are two consolidated appeals, one from an order of the trial court denying a motion for a new trial and one from the judgment subsequently entered.
The State of Minnesota petitioned for the condemnation of certain lands for trunk highway purposes and is the appellant; Gannons Inc. was respondent below and on appeal.
Gannons owns and operates a restaurant and cocktail lounge in the city of St. Paul, Minnesota. Prior to January 1961, it had 215 feet of frontage on what was then West Seventh Boulevard, an undivided thoroughfare with a traveled surface of 85 feet and a total width of approximately 200 feet. The boulevards on either side of the traveled portion of the roadway were ornamented with grass and trees. South of Gannons, West Seventh Boulevard entered directly onto the Seventh Street Bridge. The Mississippi River Boulevard intersected West Seventh Boulevard south of the Gannon premises at the entrance to the Seventh Street Bridge and north of Gannons West Seventh Boulevard entered into both Edgcumbe Road and West Seventh Street.
As a result of highway construction, completed November 15, 1962, the main traveled lanes of the roadway adjacent to Gannons were divided to provide for one-way traffic in northerly and southerly directions, and the alignment of the new thoroughfare shifted to the west. No significant change of grade occurred adjacent to the restaurant, where a portion of old West Seventh Boulevard was converted into a service *325 drive for the use of abutting properties. Gannons' immediate access to the main traveled lanes was confined to ramp roads via the frontage road connecting with the northbound lane at a point 750 feet north of the restaurant. Access from the northbound lane to Gannons was made available by a ramp joining the frontage road adjacent to Gannons at a point 250 feet south of the south entrance to Gannons' parking lot, and by a ramp entering the frontage road at a point 190 feet north of the north entrance to Gannons' parking lot.
Access from Gannons to the southbound lane and from the southbound lane to Gannons was rendered circuitous and is available either at a half-cloverleaf interchange 400 feet south of the restaurant or at a point 750 feet north of the property.
Upon learning of the plans for highway construction, Gannons petitioned to compel the state to commence a condemnation proceeding. On March 22, 1961, the district court of Ramsey County granted the petition, and action was commenced and commissioners appointed in October 1961 to determine damages, if any, resulting from the state's construction program. The commissioners filed their report on July 3, 1962, to the effect that no damages had resulted. Gannons appealed to the district court from this decision and the case was brought on for trial by a jury which awarded damages.
During the trial in district court Eugene B. McDonough, the president of Gannons and a registered professional surveyor, testified that due to the construction of the interchange the damages to Gannons' properties amounted to $101,000. He alleged a change in the highest and best use of the property from restaurant to industrial as a result of the change in access. On cross-examination it was revealed that Gannons had completely redecorated and refurnished the restaurant interior and repainted the exterior after the highway construction was completed. It was also revealed that an extensive advertising campaign was conducted at that time. The most important factor brought out under cross-examination was that its restaurant business had increased since the state's highway construction improvement and that more patronage than ever before had reached the property.
Edward Lorens, a right-of-way engineer for the State Highway Department, testified in behalf of the state that in his opinion Gannons had reasonably suitable and convenient access, in spite of the fact that the restaurant cannot be seen by the traveling public going in an easterly direction across the new Mississippi River bridge, until after the turn-off, and by those traveling in a westerly direction until they are past their turn-off. He compared Gannons to similar properties which had prospered after highway construction of a comparable nature to that completed adjacent to Gannons.
The State Highway Department also called one of the commissioners who testified that the reason for their denial of an award was that the access was suitable to Gannons and consequently its properties had not been damaged by the highway construction.
One construction feature more than any other that changed the nature of the access to Gannons restaurant was the division of the main traveled lanes by a median strip, which prevented traffic crossing from the north to the southbound lanes. According to Mr. McDonough, the most important factor contributing to the suitability and desirability of the Gannons access prior to the reconstruction was the fact that access to West Seventh Boulevard was tantamount to access to and from Minneapolis, the Mississippi River Boulevard, Edgcumbe Road, West Seventh Street, and downtown St. Paul, because at that time West Seventh Boulevard was not separated or divided by a median in front of Gannons.
The general rule is that any evidence which legitimately bears upon the *326 market value, either before or after the taking, including damage inflicted upon the part remaining, should be received. State, by Lord v. North Star Concrete Co., 265 Minn. 483, 122 N.W.2d 118. Where property is taken for public use in condemnation proceedings, any evidence is competent and any fact may properly be considered which legitimately bears on the market value of the property. State, by Lord v. Malecker, 265 Minn. 1, 120 N.W.2d 36; Regents of the University of Minnesota v. Irwin, 239 Minn. 42, 57 N.W.2d 625; State, by Lord v. Red Wing Laundry & Dry Cleaning Co., 253 Minn. 570, 93 N.W.2d 206.[1] The landowner cannot claim inconsistent uses for land which was taken by condemnation nor can he show his particular plans and intentions; however, he may show any uses, present or future, which are sufficiently practicable and probable and will be likely to influence the price which a present purchaser would give for the land. State, by Lord v. Casey, 263 Minn. 47, 115 N.W.2d 749; State, by Lord v. Malecker, supra.
The record indicates that a value witness, Mr. Winfield A. Mitchell, as well as Mr. McDonough, based his appraisal of damages upon anticipated losses immediately before and after the highway construction was commenced. As the record stands there are admissions and testimony on the part of Gannons which might be taken to indicate that the best use of the condemned property for restaurant purposes has not changed because of the highway construction and diversion of traffic, and that its business has since increased and prospered. For that reason the state contends that a jury verdict of $45,000 presumed to be based upon a reduction of access only was in part based upon unreliable and unsound testimony plus assumptions made prior to completion of the highway construction. This court held in the recent case of Sanchez v. Waldrup, 271 Minn. 419, 136 N.W.2d 61, that where the foundation for an opinion of an expert is unreliable, the opinion likewise is unsound, and a verdict based on it cannot stand. See, also, 14 Dunnell, Dig. (3 ed.) §§ 7142 and 7160.
1-3. The relief sought in the case at bar is damages for denying Gannons access to the main traveled portion of the newly constructed highway. The rules applicable where damages are sought for denial or reduction of rights of access have been established in this state by the recent case of Hendrickson v. State, 267 Minn. 436, 127 N.W.2d 165, 167, where this court held that "[n]otwithstanding the availability of a frontage road from which his abutting property has circuitous access to the main thoroughfare at remote interchanges, an owner suffers compensable damage if the highway to which he previously had immediate and unlimited access is rebuilt on the existing right-of-way in a manner which denies him reasonably convenient and suitable access to the main thoroughfare in at least one direction." In considering the approach to the matter of loss of access and in describing which activities confer a right to damages and which do not, we stated in the Hendrickson case (267 Minn. 440, 127 N.W.2d 169):
"The weight of authority, including Minnesota, treats access to a public highway from abutting property as a right which may not be denied without compensation. Where, as here, there has been no taking of additional land and the abutting property still has access to a service road constructed on the old right-of-way but can no longer be reached from the main thoroughfare except by a circuitous route, the problem of dividing the consequential economic impact between the abutting owner and the traveling public presents a difficult question of public policy. All courts seem to agree that if the regulation or restriction falls within the state's `police power,' no compensable loss has occurred. Included in this category are the establishment of *327 one-way streets and lanes of traffic; median strips prohibiting or limiting crossovers from one lane of traffic to another; restrictions on U-turns, left and right turns, and parking; and regulations governing the weight, size, and speed of vehicles. No compensable damages are sustained by such restrictions and regulations which govern all motorists, including abutting property owners, once they are on the traveled portion of the thoroughfare. While courts have assumed that designating a regulation an exercise of police power prevents compensation by eminent domain proceedings, for practical purposes this is simply a convenient way of describing which activities confer a right to damages and which do not. The prohibiting or limiting of access to a highway may well be an exercise of police power in the sense that it is designed to promote traffic safety, but at the same time it may cause compensable injury to an abutting owner. The damage to him must be different in kind and not merely in degree from that experienced by the general public. The weight of authority, with which we agree, holds that a property owner has no vested interest in the continued flow of the main stream of through traffic, and the state may divert it to a new location without being liable for consequential economic losses which owners abutting on the old highway may sustain. Those who are not abutting owners have no right to damages merely because access to a conveniently located highway may be denied, causing them to use a more circuitous route.
* * * * * *
"It will be the duty of the trial court to determine by appropriate inquiry the proposed location of the nearest permanent interchange which will allow access from the service road to the main thoroughfare in at least one direction.
"What is reasonable ingress and egress is a fact question. If the jury decides that the location of the proposed interchange substantially impairs plaintiffs' right to reasonably convenient and suitable access to the main thoroughfare, plaintiffs are entitled to damages. Not every denial of immediate or convenient access, however, will support a claim for damages unless the aggravation is to a degree we have here proscribed. It is conceivable in some instances that residential as well as other property may actually benefit by a service road which relieves it of dependence on a heavily traveled thoroughfare for ingress and egress to the surrounding area.
"If the jury determines that plaintiffs are entitled to recover, the measure of damages is the difference between the market value of the property before and after suitable access has been denied. In awarding damages the jury may consider any change in the highest and best use which may have consequently occurred. For this limited purpose the court may in its discretion receive with caution evidence of lost patronage. However, no damages as such may be assessed for diversion of traffic or for loss of customers, business, goodwill, income, or profits since the latter depend not only on the location of access but on such complex and intangible variables as the initiative and industry of the proprietors. Personal attributes such as these will continue to influence the success or failure of a business enterprise wherever it is located. Hence, the diminution in value of only the real estate is relevant.

"Finally, the jury will, of course, consider the distance to the nearest permanent interchange or crossover which permits access in at least one direction, and the extent to which the service road may mitigate the damages." (Italics supplied.)
4. When submitting the instant case to the jury, though requested, the trial court failed to instruct on the police power of the state to control traffic by median strips or dividers without the payment of compensation.
*328 The state contends that had the highway authorities, as a public safety measure, prior to January 3, 1961, elected to place a median strip in West Seventh Boulevard from Wheeler Avenue on the north to the Mississippi River Boulevard on the south, and further determined that it was necessary to limit "U" turns at either end of such a median, the effect upon the access and traffic pertaining to respondent's restaurant would have been almost identical to the effect created by the construction in fact accomplished. We agree that even though the separation of West Seventh Boulevard in the manner suggested in the state's hypothetical situation would have had a profound effect on traffic patterns and accessibility, it could not have been made the basis of compensation under the law of this state or the vast majority of other states. See, Hendrickson v. State, supra; Annotation 73 A.L.R.2d 689, 694. Furthermore, it seems clear that the separation of Highway No. 5, which affected the flow of traffic in the vicinity of Gannons, was not a compensable aspect of the state's construction since the only features of highway construction which may form the basis for the payment of compensation for damages to access are those features dealing with access from abutter's property to the main traveled lanes.
5-6. The trial court refused to instruct the jury, pursuant to the state's request, that the separation or division of the main traveled lanes adjacent to Gannons was a noncompensable element of the state's construction. It is obvious that the dividing of a highway will have a marked effect upon traffic patterns and access in any situation, and because of this, the condemnor is entitled to have the jury be advised by the court that such a separation is noncompensable. State Highway Comm. v. Keneally, 142 Mont. 256, 384 P.2d 770.
We think it obvious that an exercise of the power of the state to regulate travel on its highways for the safety and convenience of the general public was established by the evidence and that the proposed instructions on the part of the state concerning the police power and the non-compensability of actions taken under such power should have been given; also that it was prejudicial error not to do so. It is well established that in a condemnation proceeding where damages are alleged by an abutting property owner as the result of the construction of a controlled access highway on an existing roadway, a condemnor is entitled to an instruction on the police power of the state to control traffic by median strips or dividers and by other reasonable restrictions without payment of compensation, so that the jury in arriving at its verdict may understand what elements of highway construction can, and what cannot, be made the basis of compensation to an abutter.
The testimony of Mr. Lorens, when viewed in its entirety, established that the safety and convenience of the traveling public was a factor in the construction of the West Seventh Street interchange and in separating traffic by median strips to prevent left turns and head-on collisions. It is likewise clear that the separation of the main traveled lanes, as well as the grade separation at the Mississippi River Boulevard, was necessary for the safe flow of traffic and the welfare of the traveling public.
The state contends that the failure to give its requested instructions on the police power of the state interfered with the adequate presentation of its case, thereby permitting the jury to base its verdict upon noncompensable elements of the construction of a controlled access highway. The state also contends that the court erred in failing to instruct the jury that the loss of view from Gannons of the trees, foliage, and greenery located in the boulevards on either side of the traveled portion of West Seventh Boulevard was not compensable; and that the court erred in its instructions upon reasonably suitable and convenient access, and on the elements and measure of damages.
*329 The law is well settled in this state and other states that the dividing of a roadway by median strips or dividers cannot be made the subject of compensation in condemnation. See, Hendrickson v. State, supra; People ex rel. Department of Public Works v. Ayon, 54 Cal.2d 217, 5 Cal. Rptr. 151, 352 P.2d 519; Iowa State Highway Comm. v. Smith, 248 Iowa 869, 82 N.W.2d 755, 73 A.L.R.2d 680; State, By and Through State Highway Comm. v. Burk, 200 Or. 211, 265 P.2d 783; People v. Sayig, 101 Cal.App.2d 890, 226 P.2d 702; Holman v. State of California, 97 Cal. App.2d 237, 217 P.2d 448; Langley Shopping Center v. State Roads Comm., 213 Md. 230, 131 A.2d 690; Ryan v. Rosenstone, 20 Ill.2d 79, 169 N.E.2d 360; 73 A.L.R.2d 689, 694.
It seems to be well settled that an owner of property abutting a highway has no right to continuation of a flow of traffic directly in front of his property. A complete or unreasonable blocking of an abutter's access, detrimental to the value of his property, would take from him a property right in the nature of an easement and thus would require resort to eminent domain. However, it is generally recognized that ingress and egress to a particular lane of a highway and direction of travel thereon can be regulated under the police power of the state for public safety and general welfare, without compensation to an abutter who is furnished unrestricted right of access to a lane of the highway upon which his property abuts and which connects reconstructed lanes at designated points. Hendrickson v. State, supra.
Minn.St. 160.08 states that the Highway Department has the authority to construct a "controlled access highway." This authority was never disputed nor was it an issue in the case at bar. The right of the state to build Highway No. 5 was established when the petitions were allowed for the condemnation of the required lands west of Gannons. See, State, by Hilton v. Voll, 155 Minn. 72, 192 N.W. 188; State, by Benson v. Erickson, 185 Minn. 60, 239 N.W. 908; Housing and Redevelopment Authority, etc. v. Mpls. Metropolitan Co., 259 Minn. 1, 104 N.W.2d 864; State, by Mondale, v. Ohman, 263 Minn. 115, 116 N. W.2d 101.
The issue in the case at bar was the compensability of the Highway Department's reconstruction of Highway No. 5 as it affected the Gannon property. As noted, the most important aspect in the state's construction was the division of the main traveled lanes of the thoroughfare, admitted by the trial court to be noncompensable. But the trial court failed to so advise the jury, and under the circumstances it would have to be conceded that the instruction left an impression that there was nothing the state might do in the construction or regulation of a highway which the jury could not use as a basis for finding damages.
The court in charging the jury stated that if Gannons had reasonable access to the main thoroughfare "in at least one direction" then it suffered no damages; and also that "it is the law" that the owner would be damaged if the reconstruction "denies him reasonable, convenient and suitable access to the main thoroughfare in at least one direction." The jury may well have become confused to the extent of construing the foregoing statements to mean that compensable damages have occurred if reasonable access is denied in one direction or it could be construed to mean that no damages have occurred if reasonable access is available in one direction. This is especially so under circumstances where the relationship of the phrase "one direction" to the concept of the division of highways and the role of the state under its police power to divide highways was not placed before the jury by an appropriate instruction, even though requested by the state.
It is well established that as against a mere general or basic charge a party is entitled to a specific instruction on his *330 theory of the case if there is evidence to support it and if a proper request for such instruction has been made. Chicago & N. W. Ry. Co. v. Green (8 Cir.) 164 F.2d 55; Chicago, R. I. & P. R. Co. v. Lint (8 Cir.) 217 F.2d 279; 53 Am.Jur., Trial, § 626. In Luther v. Standard Conveyor Co., 252 Minn. 135, 141, 89 N.W.2d 179, 184, this court said:
"* * * A party is entitled to an instruction based upon his theory of the case if there is evidence to support it; and if the requested instruction is not entirely proper, it is the duty of the court to correct it. This it failed to do and the defendant is, therefore, entitled to a new trial * * *."
7. It is clear that the court also erred in refusing to instruct the jury on the noncompensability of the loss of view from Gannons of the trees, foliage, and greenery located in the boulevards on either side of the traveled portion of West Seventh Boulevard.
8. The state contends that the trial court erred in instructing the jury to compute interest at an unspecified rate from the date of the commissioners' award and to add such interest to their verdict. While the state did not make an objection for the record to this portion of the court's charge, they now contend that the instruction constituted error within the meaning of Rule 51, Rules of Civil Procedure. Minn. St. 117.16 provides that all damages (which means damages awarded) shall bear interest from the time of filing of the commissioners' report. Interest on awards in eminent domain proceedings is entirely controlled by statute and the computation of interest in condemnation is properly a matter pertaining to the entry of judgment; the law presumes that it will not be included in the award. See, Bruns v. Town of Nicollet, 186 Minn. 259, 243 N.W. 74; Ford Motor Co. v. City of Minneapolis, 143 Minn. 392, 173 N.W. 713; 18 Minn.L.Rev. 878.
Since prejudicial error appears to have been committed on the part of the court based upon the state's theory of the case and a denial of certain requested instructions, the state clearly appears to be entitled to a new trial. The judgment below is accordingly vacated, the order denying state's motion for a new trial reversed, and the case remanded for a new trial.
Reversed and new trial granted.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS
PER CURIAM.
Respondent appeals from the clerk's taxation of costs and disbursements, contending that Minn.St. 117.20, subd. 8(d), precludes taxation of costs and disbursements in the supreme court in favor of the state on an appeal in condemnation proceedings.
This subdivision, in its entirety, was added as an amendment in 1959[1] and modified in 1963.[2] Clause (d) thereof reads as follows:
"The court may, in its discretion, after a verdict has been rendered on the trial of an appeal allow as taxable costs reasonable appraisers' fees not to exceed $150 for each appraiser and not more than two appraisers. The court may, in its discretion, allow as taxable costs reasonable expenses for moving personal property incurred by a person occupying a residence and who is the fee owner, contract for deed vendee or lessee, but such amount shall in no event exceed $200. Where nonresidential property or a farm has been acquired, the court may in its discretion allow as taxable costs the reasonable expenses of moving personal property within the state of Minnesota for a distance not to exceed 50 miles if such expenses have been incurred by a person occupying the property as the fee owner, contract for deed vendee or lessee, but in no event shall this amount exceed *331 $3,000. The court may in its discretion allow such moving costs and appraisers' fees whether or not the parties entitled thereto are the prevailing parties. If moving costs are allowed by the court, in those cases arising out of land acquisition for the interstate system of highways, the person to receive such costs shall submit to the state on forms provided by the state a written claim supported by receipted bills or other acceptable evidence of the expenses incurred, together with other information required, so that the state may receive federal participation in such moving costs. No costs shall be taxed by the state against any other party." (Italics supplied.)
Respondent points to the last sentence above quoted as authority for contending that taxation of costs and disbursements is precluded on the appeal in the instant case.
It is clear, however, that § 117.20, subd. 8(d), applies only to the taxation of particularized costs in the district court specific costs that exist at the district court level. Furthermore, we think it clear that the last sentence of subd. 8(d) simply limits the items that can be taxed as costs in the district court in condemnation cases.
The general rule for taxation of costs on appeal to the supreme court in condemnation proceedings is contained in § 117.20, subd. 4, which provides:
"At any time within 40 days from the date of the filing of the report, any party to the proceeding may appeal from any award of damages embraced in the report, or from any omission to award damages, by filing with the clerk a notice of such appeal; which shall specify the particular award or failure to award appealed from, the nature and amount of the claim, the land to which it relates, and the grounds of the appeal; and upon appeal the prevailing party shall recover costs and disbursements." (Italics supplied.)
It is important to note that subd. 4 was not changed when subd. 8 was added in 1959. It is also important to note that subd. 8(c) provides in part:
"Such appeal may be noticed for trial as in the case of a civil action, and the court may direct that issues be framed, * * *. Except as herein otherwise provided, the trial shall be conducted and the cause disposed of according to the rules applicable to ordinary civil actions in the district court." (Italics supplied.)
Since clauses (c) and (d) of subd. 8 were enacted at the same time, we must assume that the legislature had no intention that clause (d) should bring about any change in the method of taxing costs in the supreme court. If it had had such an intention, it would not have reaffirmed this method in clause (c).
Nothing in § 607.01 or Supreme Court Rule XV (222 Minn. xxxvii), governing taxation of costs and disbursements in this court, precludes taxation of costs in behalf of the state in condemnation cases. Contrary to respondent's contention, costs and disbursements may be taxed against the state in condemnation appeals in the supreme court, and have in fact been consistently taxed in the past. See, State, by Peterson v. Bentley, 231 Minn. 531, 546, 45 N.W.2d 185, 194; State, by Lord v. Anderson, 251 Minn. 401, 87 N.W.2d 839, 928. It is plain that the authority of the supreme court to tax costs and disbursements both against and in favor of the state in condemnation appeals is clearly established under the provisions of § 117.20, subd. 4, as interpreted in those decisions.
Since the statute cited by respondent is applicable only to the taxation of costs in the district court and the state is unquestionably the prevailing party,[3] the taxation of costs by the clerk of this court is affirmed.
NOTES
[1] See, 6 Dunnell, Dig. (3 ed.) §§ 3068 and 3069.
[1] L.1959, c. 656, § 2.
[2] L.1963, c. 554, § 1.
[3] Henderson v. Northwest Airlines, Inc., 231 Minn. 503, 511, 43 N.W.2d 786, 792; Sanborn v. Webster, 2 Minn. 323 (Gil. 277).